United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,                  Case No. 16-20696

        v.                     Hon. Stephen J. Murphy, III

D-1 Charles Mason,

        Defendant.

_____/

## United States's Sentencing Memorandum

Charles Mason is an experienced, unrepentant thief. This case is Mason's ninth conviction for a theft-related offense before the age of 23, and he has similar charges pending in cases in Wyandotte and Beverly Hills, California. (PSR ¶¶ 49–67). Mason started with simple larceny, but graduated to largescale credit card fraud once he learned how to acquire stolen credit card accounts. Mason was so prolific that people in Detroit dubbed him the "million dollar man" on social media. Indeed, over 3,000 stolen credit card accounts have been linked to Mason; he used just one to spend over $69,000 in a single month. Despite his multiple arrests in this case, Mason also refuses to accept responsibility. He lied to federal agents about his actions, and he

objected to the presentence report with claims directly contradicted by the detailed evidence in this case *and his own statements during the plea colloquy*. These frivolous denials call into question whether he does, in fact, accept responsibility for his repeated misconduct. Because of the severity of his actions and his utter lack of remorse, as well as to deter others engaged in such conduct, the government asks for a sentence of 234 months.

## I.      Factual and Procedural History

### A.      <u>Offense Conduct</u>

In the fall of 2015, Mason became a professional "swiper"— meaning, he learned how to obtain stolen credit card accounts and produce counterfeit cards. Mason then used those counterfeit cards to buy anything and everything he pleased. He went on lavish vacations. He traveled all over the country to buy high priced electronics (*e.g.*, Apple iPhones and iPads, Sony PlayStations) that he resold in Michigan for pennies on the dollar. He bought legitimate gift cards to launder the stolen credit cards into clean money. He even purchased several dozen pairs of expensive sneakers. (*See* Gov't. Ex. A). But Mason has very little to show for his yearlong crime spree. Perhaps this is

2

understandable; after all, Mason had no reason to save because he need only steal more credit card accounts each day to start anew.

Specifically, in November 2015, Mason obtained a credit card account ending in 3896 belonging to P.B., and he produced a counterfeit card with his name, but P.B's account number embossed on the front and encoded on the magnetic strip. (*See* Gov't. Ex. B). Mason used this card to rent executive cars, shop at Armani, Saks Fifth Avenue, True Religion, Nordstrom, and Neiman Marcus, and fly to Miami and stay in South Beach. He even sat courtside to watch the Miami Heat. (*See* Gov't Ex. C). Mason also shared this card with friends. The spree only stopped because Mason was caught trying to use the card to buy two hoverboards for $399.99 (each) at a toy store in Taylor.

Mason continued with credit card fraud despite losing P.B.'s card. He simply made new ones. In December 2015, police stopped Mason for a traffic violation. Inside his car, police found 54 gift cards. Ten of the cards were counterfeit—meaning, the numbers encoded on the magnetic strip were stolen credit card accounts different from the actual account number on the front of the card. The rest of the cards were blank; basically, they were precursors for Mason to use to create counterfeit

3

cards later. Mason also had a credit card skimmer.

In February 2016, Mason was arrested again. He went to a Meijer in Southfield, Michigan, with a stack of 88 counterfeit cards. Mason used the cards to purchase 44 $500 Target gift cards and one $500 JCPenny gift card. But he was sloppy; Mason would swipe a counterfeit card until it no longer worked and then simply turn to the next one. This raised the attention of store employees, who called the police. Mason tried to run and threw the cards to the ground, but he was arrested. Police recovered $19,500 of the gift cards; they suspected the missing $2,500 were given to a cashier to overlook the fraud. Police interviewed Mason, but he lied about the source of the cards, claiming that he got them from guys in Inkster.

By this point, the FBI had learned about Mason as part of a larger investigation into a street gang in Detroit called Bandgang. Initially, the FBI focused on shootings and other violent crime conducted by Bandgang members, but by the spring of 2016, agents realized that, unlike traditional street gangs that fund their criminal activities through drug trafficking, Bandgang used stolen credit card accounts purchased on the dark web to further their objectives. Bandgang

4

members used stolen credit cards, in part, because it was far less likely to draw the attention of law enforcement. Plus, if caught, they knew from personal experience that courts frequently give lenient sentences in such cases, treating it as a "property crime" in which "no one" was really hurt.

The FBI searched Mason's house. Inside the house, agents found a box of blank gift cards, 9 counterfeit gift cards, laptops, and device-making equipment. Specifically, they found a MSR605 magnetic strip read/write encoder, a Wonder Manual Embosser, and a Dymo label maker. (*See* Gov't Ex. D). Agents reviewed the laptop and discovered Mason had used it to buy over 600 stolen credit cards from illegal "dump" websites. Dump sites are typically accessed on the dark web, and users can purchase stolen credit card accounts (or other types of identity information) similar to shopping on Amazon. Mason, in particular, used a dump site called Joker's Stash, and he spent over $31,000 on this site to buy over 3,000 stolen credit card accounts. (*See* Gov't Ex. E). Mason targeted bank identification numbers (or, BINs) used by Canadian banks because, in his view, they were more likely to work.

5

In June 2016, Mason met with agents and prosecutors with the U.S. Attorney's Office as part of the investigation into Bandgang. Mason agreed to speak with the FBI to discuss his possible cooperation in the case. He was represented by counsel, and he was warned not to make any material false statements in the course of his interview. Nonetheless, Mason made multiple false statements in an effort to mislead the investigation. Mason claimed, for example, that he first got involved in swiping by happenstance—that a person contacted him on Facebook and sent him counterfeit cards as a way to make money. This was not true. Mason also admitted reselling iPhones and other items to a store in Redford called I-Exchange, but claimed he only earned $16,000 this way. Agents frequently admonished Mason and warned him of the consequences of making false statements. They reminded him that he, in fact, earned over $50,000 from I-Exchange and that they knew a great deal about his activities. But Mason continued to try to mislead them.

In August 2016, after the FBI confirmed that his statements in June were, in fact, false, his attorney was informed that charges would

be filed shortly. Mason did not stop his illegal conduct, but instead

taunted the FBI on his Twitter account:

| September 14, 2016 | Middle finger to the opps we don't talk to the cops |
|---|---|
| September 14, 2016 | Let's keep getting that money , ain't no point of running if they coming they coming period |
| September 23, 2016 | Fucking RATS ●●  ●●  ●●●  ●●●  ●●●  ●● |
| September 24, 2016 | Niggas scared to get rich Ima just lead the way #fuck12[1] |
| October 7, 2016 | These iPhones for the Feds don't forget that |

Mason also traveled to Beverly Hills, California, in October 2016, and

was arrested when he tried to buy a $13,000 Cartier watch with a

fraudulent credit card.

In October 2016, agents located Mason to arrest him and again

searched his residence. Inside the house, agents found 7 counterfeit

credit cards with blank magnetic strips,[2] 18 counterfeit credit cards in

which the account number on the front of the card did not match the

---

[1] "Fuck12" is slang for "fuck the police."

[2] A counterfeit card with a blank magnetic strip is typically called a
"punchie." After the holder attempts to swipe the card in a checkout
line, the card is given to the cashier to "punch" in the stolen account
number on the front of the card.

7

number encoded on the back, and dozens of blank cards. (*See* Gov't Ex.

F). They also found a fake Pennsylvania driver's license with Mason's

picture on it. The agents also saw multiple notifications visible on

Mason's iPhone advertising recent "dumps" for sale and looking for

people to go swiping. (*See* Gov't. Ex. G).

    B.    <u>Procedural History</u>

A grand jury charged Mason in an eleven-count indictment:

| Count | Offense | Statute |
|:---:|---|---|
| 1 | use of an unauthorized access device fraud | 18 U.S.C. § 1029(a)(2) |
| 2 | aggravated identity theft | 18 U.S.C. § 1028A(a)(1) |
| 3 | possession of device-making equipment | 18 U.S.C. § 1029(a)(4) |
| 4 | possession of fifteen or more counterfeit or unauthorized access devices | 18 U.S.C. § 1029(a)(3) |
| 5 | aggravated identity theft | 18 U.S.C. § 1028A(a)(1) |
| 6 | production of a counterfeit access device | 18 U.S.C. § 1029(a)(1) |
| 7 | possession of device-making equipment | 18 U.S.C. § 1029(a)(4) |
| 8 | false statement made to a department of the United States | 18 U.S.C. § 1001 |

| 9 | possession of fifteen or more counterfeit or unauthorized access devices | 18 U.S.C. § 1029(a)(3) |
|---|---|---|
| 10 | aggravated identity theft | 18 U.S.C. § 1028A(a)(1) |
| 11 | conspiracy to commit access device fraud | 18 U.S.C. § 1029(a)(3), (b)(2) |

(R. 16: Superseding Indictment, 38). Mason pleaded guilty to counts 1-4 and 7–11; in exchange, the government agreed to dismiss counts 5 and 6. (R. 30: Plea Agreement, 82).

Mason faces a maximum term of imprisonment of 74 years, a fine of $250,000 (per count), a special assessment of $900, and a 3-year term of supervised release.

## II.  Sentencing Guideline Calculations and Relevant 3553(a) Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered to impose a sentence "sufficient, but not greater than necessary." Those objectives include: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and

9

rehabilitation); (3) the kinds of sentences legally available; (4) the

Sentencing Guidelines; (5) Sentencing Commission policy statements;

and (6) the need to avoid unwarranted sentencing disparities

(nationwide) among defendants with similar records found guilty of

similar conduct. But sentencing starts with the calculation of the

Guidelines range to promote the sentencing goals of Congress, namely

to "provide certainty and fairness in meeting the purposes of

sentencing, while avoiding unwarranted sentencing disparities[.]"

*United States v. Booker*, 543 U.S. 220, 264 (2005).

A.   <u>Sentencing Guidelines</u>

Probation calculated the sentencing guideline range as 151–188

months based on an offense level 31 and criminal history category IV.

(PSR ¶ 108). But Mason then objected to almost every guideline

enhancement to which he agreed in the plea agreement despite an

express provision that "[t]here are no sentencing guideline disputes"

and a prohibition against taking a position different than that reflected

in the attached guideline worksheets. (R. 30: Plea Agreement, 90, 92).

Further, Mason frivolously made several factual objections that

contradicted the evidence in this case and Mason's own admissions in

10

his factual basis and plea colloquy. Mason objected to misleading the FBI agents (Objection #2) despite pleading guilty to making a false statement in violation of 18 U.S.C. § 1001 in count 8 and admitting in his plea agreement that the false statements were made despite warnings "not to lie or attempt to mislead the FBI." (*Id.* at 89). Mason denied working with other Bandgang members cooperatively to acquire stolen credit card accounts (Objection #1) even though he said exactly that to the FBI in his June 2016 statement. And he objected to being a leader or organizer despite admitting, in his factual basis to Count 11, that he conspired with at least five people to commit access device fraud and, as part of this conspiracy, he discussed "where and how to purchase stolen credit card numbers, how to manufacture counterfeit gift cards, and where to use the counterfeit gift cards to avoid detection." (*Id.*at 90). This frivolous denial of conduct for which he pled guilty shows Mason still does not accept responsibility for his conduct. As such, he should not receive any reduction for acceptance of responsibility under USSG § 3E1.1.[3]

---

[3] The plea agreement allows the government to take a position different from the guideline worksheets if the defendant made a false statement

Application Note 1 to § 3E1.1 provides that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." But here, Mason is not denying relevant conduct but the very offenses for which he pled guilty. A defendant is not entitled to acceptance of responsibility just because he pled guilty. *Id.* at n.2. Courts routinely deny defendants acceptance of responsibility when they falsely deny facts or minimize their illegal conduct. *See United States v. Webb*, 335 F.3d 534, 538–39 (6th Cir. 2003) (acceptance withheld for defendant who gave statements to probation inconsistent with his guilty plea); *United States v. Edwards*, 635 F. App'x 186, 193 (6th Cir. 2013) (acceptance withheld when defendant's factual objections were at odds with the evidence); *United States v. Bogan*, 166 F. App'x 205, 206–07 (6th Cir. 2006) (no acceptance for defendant who "repeatedly minimized and denied criminal conduct after her guilty plea"). This Court should do the same. Without a reduction for acceptance, Mason's guideline range would be 210–262 months based on

---

to probation or "otherwise demonstrated a lack of acceptance of responsibility for his offense." (R. 30: Plea Agreement, 91).

a total offense level 34 and criminal history category IV, plus an additional 24-month term for the aggravated identity theft counts.

B.   Section 3553(a) Factors

    i.   Nature of the Offense

This is not just a simple property offense. Credit card fraud is a rampant problem too often ignored by police focusing on violent offenses. In fairness, in the hierarchy of crimes, credit card fraud is less egregious than murder, sexual assault, or armed robbery. But Mason and his Bandgang cohorts exploited this view to their advantage— knowing that police have to focus much of their time on violent crime and drug trafficking, they turned to credit card fraud to avoid the attention of law enforcement. Plus, they knew that, if arrested, the penalty would be significantly lower.

Mason's arrests in Taylor, Southfield, Southgate, and Howell illustrate this problem. Mason was arrested in Taylor in December 2015 with counterfeit cards and a skimmer, but was charged only with possessing marijuana. (PSR ¶ 58). Mason was arrested in Southfield in February 2016 with 88 counterfeit cards that he used to buy $22,000 worth of legitimate gift cards, but was not charged. He was arrested in

Southgate in April 2016 for retail fraud but received probation. (PSR ¶ 60). And he was arrested in November 2015 with other Bandgang members on a swiping trip to Howell. Mason only received a 6-month sentence because of this case (PSR ¶ 56); the other Bandgang members received 30-days.

But the problem is that the money generated by their fraud was so large that it attracted attention not from police, but from rival gangs. Mason and others flashed the "bands"[4] of cash they made from swiping on social media. (*See* Gov't. Ex. H). This led to shootings and other violence as other gangs tried to muscle into the action. In other words, even though credit card fraud itself is not "violent," it causes violence. Plus, credit card fraud, in and of itself, impacts each and every member of society independent of this violence.

ii.   <u>History and Characteristics of the Defendant</u>

Mason is 23 years old, and he is already a criminal history category IV. (PSR ¶ 63). He has been convicted of theft offenses eight times in his young life (not counting this case)—receiving and

---

[4] A "band" is $1,000.

concealing stolen property (pled down from larceny), larceny, larceny, larceny, retail fraud, retail fraud, possession of a fraudulent financial transaction device, and retail fraud. (PSR ¶¶ 49–54, 56, 60). This does not include his two prior drug convictions. (PSR ¶¶ 55, 58). And he has theft offenses pending in two other courts. (PSR ¶¶ 65, 67).

Clearly, Mason has not been deterred by prior arrests or punishment. And worse still, he refuses to accept responsibility for his actions. Mason tried to lie his way out of trouble when he met with the FBI in June 2016. (PSR ¶ 20). Despite pleading guilty and agreeing to the guidelines score in his plea agreement, Mason then objected to the PSR. He claimed, for example, that he did not mislead the agents (even though he pled guilty to such conduct). He also denied that he was a leader or organizer even though he hired multiple people to drive him to Indiana, Ohio, Pennsylvania, and elsewhere to conduct credit card fraud and he made counterfeit cards for his co-defendant, Rodrika Reed. Mason further denied that he worked in any "cooperative" way with other Bandgang members to conduct credit card fraud even though he earlier told agents that Bandgang members taught him how to purchase cards from Joker's Stash, suggested he use Canadian BINs,

15

discussed going on swiping trips with them in which he would receive a cut of any ill-gotten gains, and even asked them to make cards for him. (*See* Gov't Ex. I).

In short, Mason has learned nothing from his time in the criminal justice system, and there is every reason to believe he will return to his life of theft when released from prison.

### iii.    Seriousness of the Offense

Credit card fraud is a serious crime that affects not only the account holders, but all of society. Victims suffer monetary damages and must prove that they did not, in fact, make the charge(s) to get reimbursed. This process is lengthy, and it often involves temporary damage to the victims' credit scores. Some reports indicate it can take hundreds of hours to undo the damage. *See* Madeleine Scinto, *Beware: Credit Card Fraud Will Pound Your Score*, Business Insider, Nov. 1, 2011, http://www.businessinsider.com/beware-credit-card-fraud-will-pound-your-credit-score-2011-11.

The cost to society is enormous. There is over $11 billion in credit card fraud each year. Retailers and banks spend billions each year to combat credit card fraud, and yet there is still widespread fraud in the

16

United States. Ultimately, these costs are borne by everyone in the form of higher prices and increased fees. Adam Dolby, *Collateral Damage: The Effect of Card Fraud on Small Businesses, Customers and the Economy*, HUFFINGTON POST, April 24, 2014, http://www.huffingtonpost.com/adam-dolby/collateral-damage-the-eff_b_5206822.html

Locally, Michigan leads the nation in identity theft. Per capita, 175.6 people out of every 100,000 in the state will be the victim of identity theft. And this number is on the rise. There were 399,225 identity theft crimes in 2016—up nearly 60% over the last decade. *Michigan is #1 . . . in identity theft*, WLNS, April 14, 2017, http://wlns.com/2017/04/14/michigan-is-1-in-identity-theft/

> iv.   Promoting Respect for the Law and Providing Just Punishment

Mason has no respect for the law. He showed this through his many, many prior convictions and his repeated lies to federal agents and to probation.

In terms of just punishment, the United States believes this case warrants a sentence at the bottom of the corrected guidelines range—

17

210 months. Nationally, district courts vary from the applicable Guidelines range using the § 3553(a) factors in only 25% of fraud cases.[5] Typically, judges vary from the guidelines only when the loss amount is high, such as in white collar securities fraud cases. But that is not this case. This is a case of credit card fraud and an example of pure greed. A variance from the 210-month guideline range not only fails to justly punish Mason, it also results in an unwarranted disparity in sentencing.

     v.  <u>Need for Deterrence</u>

All of the above factors also implicate the need for a sentence to provide sufficient deterrence. Mason is young, but he shows no respect for the law or concern about his actions. This case provides an opportunity to deter him from future criminal conduct, and a minimal sentence will reinforce the idea that he can commit this type of crime without consequence. Plus, if Mason is not stringently punished, it fails

---

[5] United States Sentencing Commission, <u>Sentences Relative to the Guideline Range by Selected Primary Offense Category</u> (Fiscal Year 2016) 19, *available at* <u>http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2016/6c16.pdf</u>.

to deter his other Bandgang cohorts under investigation or pending sentencing, who will view the federal court system as laughable like they already do the state system.

Another member of Bandgang, and a prolific swiper in his own right, Keeman Bridges, recently received a 154-month sentence before Judge Roberts in case 17-20769. Judge Roberts imposed a sentence at the bottom of Bridges's guideline range because "[c]redit card fraud is becoming an epidemic in the Eastern District of Michigan as the crime is easy and there does not appear to be general deterrence." Judge Roberts observed that lenient sentences in these cases do not appear to deter people. But Bridges had a vastly different guideline range compared to Mason. Bridges did not receive an obstruction of justice enhancement, and he was only linked to 1,000 stolen accounts. As a result, his guideline range was 130–162 months based on a total offense level of 28 and criminal history category of V (plus a consecutive 24 months for aggravated identity theft). Here, Mason's guideline range is much higher; it is 210–262 months (plus a consecutive 24 months sentence for aggravated identity theft) if he does not receive a reduction for acceptance of responsibility. Like Bridges, Mason, too, should

19

receive a guideline sentence to deter the many prospective swipers that he inspired during his crime spree—the 210-month bottom of the guideline range plus 24 months for the aggravated identity theft counts.

### vi. Protecting the Public

In addition to the need to deter Mason, a sentence of 234 months will protect the public from his future illegal conduct. Clearly, his many, many convictions prior to 2016 did not deter him. A 234-month term of custody will ensure the safety of the community while Mason is in prison.

## III. Conclusion

For these reasons, the United States recommends a 234-month sentence of imprisonment.

Respectfully submitted,

Daniel L. Lemisch
Acting United States Attorney

/s/ Shane Cralle
Shane Cralle
Assistant U.S. Attorney
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9551
shane.cralle@usdoj.gov

Dated: November 6, 2017

20

**Certificate of Service**

I certify that on November 6, 2017, I electronically filed this

Sentencing Memorandum, with the Clerk of the Court using the ECF

system, which will send notification of such filing to the following

attorney of the defendant:

Mark H. Magidson
mmag100@aol.com

/s/ Shane Cralle
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9551
Fax: (313) 226-5892
Email: Shane.Cralle@usdoj.gov